**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| VITOLITE ELECTRIC SALES CO., on its own behalf and on behalf of all others similarly situated, | Case No. 1:25-cv-03447 |
| *Plaintiff*, | **Jury Trial Demanded** |
| v. | **CLASS ACTION COMPLAINT** |
| OIL PRICE INFORMATION SERVICE, LLC; ATKORE INC.; IPEX USA LLC; PIPELIFE JET STREAM, INC.; J-M MANUFACTURING COMPANY, INC., d/b/a JM EAGLE; NATIONAL PIPE & PLASTICS, INC.; CANTEX INC.; DIAMOND PLASTICS CORPORATION; PRIME CONDUIT, INC.; SANDERSON PIPE CORPORATION; SOUTHERN PIPE, INC.; OTTER TAIL CORPORATION; NORTHERN PIPE PRODUCTS, INC.; VINYLTECH CORPORATION; WESTLAKE CORPORATION; and WESTLAKE PIPE & FITTINGS CORPORATION. | |
| *Defendants.* | |

Plaintiff Vitolite Electric Sales Co. ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to Section 1 of the Sherman Act and demands a trial by jury on all matters so triable against defendant Oil Price Information Service, LLC ("OPIS") and the following manufacturers of PVC Pipe, collectively referred to herein as the "Converter Defendants":

(a)  Atkore Inc. ("Aktore");

(b)  IPEX USA LLC ("IPEX");

(c)  PipeLife Jet Stream, Inc. ("PipeLife Jet Stream");

(d)  J-M Manufacturing Company, Inc. d/b/a JM Eagle ("JM Eagle");

(e)  National Pipe & Plastics, Inc. ("National Pipe");

(f)  The "Mitsubishi/Shin-Etsu Defendants" (all of which are jointly owned by Mitsubishi Corporation and Shin-Etsu Chemical Co., Ltd.) consisting of defendant Cantex Inc. ("Cantex") and its affiliates, defendants Diamond Plastics Corporation ("Diamond"), Prime Conduit, Inc. ("Prime Conduit"), Sanderson Pipe Corporation ("Sanderson Pipe"), and Southern Pipe, Inc. ("Southern Pipe");

(g)  The "Otter Tail Converter Defendants" consisting of defendant Otter Tail Corporation ("Otter Tail") and its wholly-owned subsidiaries, defendants Northern Pipe Products, Inc. ("Northern Pipe") and Vinyltech Corporation ("Vinyltech"); and

(h)  The "Westlake Converter Defendants" consisting of defendants Westlake Corporation ("Westlake Corp.") and its wholly-owned subsidiary Westlake Pipe &

Fittings Corporation d/b/a North America PVC Pipe Corporation ("Westlake Pipe").

OPIS and the Converter Defendants are referred to collectively as "Defendants."

## I.      NATURE OF THE ACTION

1.      This lawsuit seeks both monetary and injunctive relief arising from Defendants' unlawful and ongoing agreement to fix the prices for polyvinyl chloride ("PVC") pipe sold and purchased throughout the United States and its territories, from no later than January 1, 2021 to the present day. This price-fixing conspiracy is now the subject of a criminal grand jury and U.S. Department of Justice investigation.

2.      This lawsuit involves two broad kinds of PVC pipe: (a) "Water Pipe," which includes "Plumbing PVC Pipe" used in residential and commercial plumbing to bring in clean water and drain out wastewater, piping used in HVAC systems and for agricultural irrigation, and "Municipal Pipe" used in municipal water and sewer systems, and (b) "Conduit Pipe" used as conduits (mainly for electrical wiring).

3.      The Converter Defendants are the United States' largest manufacturers of finished PVC Water Pipe and PVC Conduit Pipe (collectively, "PVC Pipe"). Finished PVC Pipe is a commodity product and the largest downstream market for PVC Resin. More than 95% of the PVC Pipe sold in the United States is under the control of the Converter Defendants.

4.      The United States PVC Pipe market reached a volume of approximately 3.75 million tons in 2023. The market is expected to reach a volume of 5.28 million tons by 2032.[1]

---

[1]      United States PVC Pipes Market Outlook, https://www.expertmarketresearch.com/reports/united-states-pvc-pipes-market#:~:text=The%20United%20States%20PVC%20pipes,5.28%20million%20tons%20by%202032 (last visited Mar. 30, 2025).

5.     The Converter Defendants are direct competitors of each other and are among the largest producers and sellers of PVC Pipe in the United States.

6.     Among the victims of the conspiracy are direct purchasers of PVC Pipe from the Converter Defendants, including municipalities, private water companies, professional contractors, retailers, and distributors.

7.     To implement their price-fixing conspiracy, the Converter Defendants exchanged detailed, competitively sensitive, non-public information about PVC Pipe prices, capacity, sales volume, supply, and demand. Defendant OPIS actively facilitated this conspiracy by providing a means for the Converter Defendants to exchange pricing data and monitor each other's adherence to the agreed-upon price increases.

8.     The price of PVC Resin (the main input of PVC Pipes) roughly doubled during Covid-19 lockdowns and supply disruptions. Instead of increasing the prices to their customers by a corresponding amount, the Converter Defendants raised their prices by almost five times their pre-pandemic levels from late 2019 to mid-2022. By the start of 2023, resin prices had returned to approximately where they were before the lockdowns, but PVC Pipe prices remain almost 4.7 times higher than pre-Covid rates.

9.     Defendants' unlawful agreement caused direct purchasers of PVC Pipe, including Plaintiff and the Class, to pay supra-competitive prices for PVC Pipe sold by Converter Defendants in the United States and its territories from the period beginning no later than January 1, 2021 and running through the date on which the Class is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

## II.     JURISDICTION AND VENUE

10.     Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton

Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

12.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

13.     Defendants all transacted business in this state. The Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process. Accordingly, Defendants are subject to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209.

14.     Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S., including in this state and this District. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this state and in this District. Accordingly, this Court has personal jurisdiction over each Defendant.

### III.  PARTIES AND UNNAMED CO-CONSPIRATORS

**A.  Plaintiff**

15.     Plaintiff **Vitolite Electric Sales Co.** is a New York corporation with its principal place of business at 24 King Street, Port Chester, NY, 10573.

16.     During the Class Period, Plaintiff purchased PVC Pipe in the United States at supra-competitive prices directly from one or more of the Converter Defendants.

**B.  Defendants**

17.     Defendant **OPIS** is a privately-owned Delaware corporation headquartered in Rockville, Maryland. OPIS merged with Dow Jones in 2022, after it was acquired by News Corp. OPIS publishes PetroChem Wire, a series of daily and weekly reports that covers the entire U.S. petrochemical market. Until recently, one such PetroChem Wire publication was "PVC & Pipe Weekly," which OPIS ceased publishing in December 2024.[2] Through PetroChem Wire reports, OPIS conspired with the Converter Defendants during the Class Period by facilitating the exchange of confidential, proprietary, and competitively sensitive data.

**The Converter Defendants**

18.     Defendant **Atkore** is a Delaware corporation headquartered in Harvey, Illinois. Atkore's common stock is listed and traded on the New York Stock Exchange under the trading symbol ATKR. Atkore is the largest manufacturer of PVC Conduit Pipe and one of the largest manufacturers of PVC Water Pipe in the United States. During the Class Period, Atkore sold finished PVC Pipe to direct purchasers throughout the United States.

19.     Defendant **IPEX** is a privately held Delaware corporation that is a wholly owned

---

[2] *Pipe Price Fixing Update: OPIS discontinues PVC & Pipe Weekly report* (Dec. 13, 2024), https://manbearchicken.substack.com/p/pvc-price-fixing-update (last visited Mar. 31, 2025).

subsidiary of Belgium-based Aliaxis S.A./N.V., and is headquartered in Pineville, North Carolina. IPEX is one of the largest U.S. producers of both PVC Conduit Pipe and PVC Water Pipe. During the Class Period, IPEX sold finished PVC Pipe to direct purchasers throughout the United States.

20. Defendant **JM Eagle** is a privately held California corporation headquartered in Los Angeles, California. JM Eagle is a leading producer of both PVC Conduit Pipe and PVC Water Pipe in the United States, with a 23% share of the U.S. finished PVC Pipe market. During the Class Period, JM Eagle sold finished PVC Pipe to direct purchasers throughout the United States.

21. Defendant **National Pipe** is a Delaware corporation headquartered in Endicott, New York and a wholly-owned subsidiary of Ireland-based CRH, plc. National Pipe is a leading producer of both PVC Conduit Pipe and PVC Water Pipe in the United States, controlling at least 7% of the U.S. market for finished PVC Pipe. During the Class Period, National Pipe sold finished PVC Pipe to direct purchasers throughout the United States.

22. Defendant **PipeLife Jet Stream**, a Delaware corporation headquartered in Siloam Springs, Arkansas, is a wholly-owned subsidiary of Austria-based PipeLife International GmbH Group. PipeLife Jet Stream manufactures PVC Water Pipe for municipal water and sewer, well casing, plumbing, and irrigation. During the Class Period, PipeLife Jet Stream sold finished PVC Pipe to direct purchasers throughout the United States.

**The Mitsubishi/Shin-Etsu Converter Defendants**

23.     Defendant **Cantex** is a Delaware corporation with its headquarters in Fort Worth, Texas. Cantex is jointly owned by Mitsubishi Corporation ("Mitsubishi") and Shin-Etsu Chemical Co., Ltd. ("Shin-Etsu"). Cantex controls 15% of the U.S. market for PVC Conduit Pipe. During the Class Period, Cantex sold finished PVC Pipe to direct purchasers throughout the United States.

24.     Defendant **Diamond** is a Delaware corporation with headquarters in Grand Island, Nebraska. It is jointly owned by Mitsubishi and Shin-Etsu. Diamond is a leading U.S. producer of PVC Water Pipe, with at least a 12% share of the U.S. finished PVC Pipe market. During the Class Period, Diamond sold finished PVC Pipe to direct purchasers throughout the United States.

25.     Defendant **Prime Conduit** is a privately held Delaware corporation with a principal place of business in Chagrin, Ohio. It is jointly owned by Mitsubishi and Shin-Etsu. Prime Conduit is a leading manufacturer of PVC Conduit Pipe, with 15% of the U.S. market. During the Class Period, Prime Conduit sold finished PVC Pipe to direct purchasers throughout the United States.

26.     Defendant **Sanderson Pipe** is a Delaware corporation headquartered in Clarksville, Tennessee. It is jointly owned by Mitsubishi and Shin-Etsu. Sanderson Pipe supplies PVC Pipe throughout the Midwest and Southeast. During the Class Period, Sanderson Pipe sold finished PVC Pipe to direct purchasers throughout these parts of the United States.

27.     Defendant **Southern Pipe** is a Delaware Corporation headquartered in New London, North Carolina. It is jointly owned by Mitsubishi and Shin-Etsu. Southern Pipe is one of the largest privately held, independent distributors of brand name plumbing, heating, air-conditioning (HVAC), industrial, mechanical, and water works supplies in the Southeast United States. During the Class Period, Southern Pipe sold finished PVC Pipe to direct purchasers throughout the United States.

**The Otter Tail Converter Defendants**

28.     Defendant **Otter Tail** is a publicly traded Minnesota corporation headquartered in Fergus Falls, Minnesota. Otter Tail's common stock is listed and traded on the NASDAQ Stock Exchange under the trading symbol OTTR. Although branded as a utility company, 70% of Otter Tail's profits come from its PVC Water Pipe business. Otter Tail is one of the largest manufacturers of PVC Water Pipe in the United States and has garnered 6% of the finished PVC Pipe market. During the Class Period, Otter Tail sold finished PVC Pipe to direct purchasers throughout the United States.

29.     Defendant **Northern Pipe** is a wholly-owned subsidiary of Defendant Otter Tail. Northern Pipe is a North Dakota corporation with a principal place of business in Fargo, North Dakota. During the Class Period, Northern Pipe sold finished PVC Pipe to direct purchasers throughout the United States.

30.     Defendant **Vinyltech** is a wholly-owned subsidiary of Defendant Otter Tail. Vinyltech is an Arizona corporation with a principal place of business in Phoenix, Arizona. During the Class Period, Vinyltech sold finished PVC Pipe to direct purchasers throughout the United States.

31.     As Northern Pipe and Vinyltech are under the control of Defendant Otter Tail both generally and with respect to the conduct of Otter Tail in furtherance of the unlawful acts alleged in this Complaint, Defendants Otter Tail, Northern Pipe, and Vinyltech are collectively referred to herein as "Otter Tail."

**The Westlake Converter Defendants**

32.     Defendant **Westlake Corp.** is a publicly traded Delaware corporation headquartered in Houston, Texas. Westlake Corp.'s common stock is listed and traded on the New

York Stock Exchange under the trading symbol WLK. Westlake Corp. is one of the largest manufacturers of PVC Water Pipe in the United States, controlling at least 12% of the finished PVC Pipe market. During the Class Period, Westlake Corp. sold finished PVC Pipe to direct purchasers throughout the United States.

33. Defendant **Westlake Pipe**, a Delaware corporation with a principal place of business in Houston, Texas, is a wholly-owned subsidiary of defendant Westlake Corp. During the Class Period, Westlake Pipe sold finished PVC Pipe to direct purchasers throughout the United States.

34. As Westlake Pipe is under the control of Westlake Corp. both generally and with respect to the conduct in furtherance of the unlawful acts alleged in this Complaint, Defendants Westlake Corp. and Westlake Pipe are collectively referred to herein as "Westlake."

### Agents and Unnamed Co-Conspirators

35. Persons and/or firms not named as Defendants in this Complaint may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not named as defendants in this Complaint.

36. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

37. Where Plaintiff ascribes an action to Defendants, unless stated otherwise, the action is alleged to have been taken by each Defendant.

### IV.    FACTUAL ALLEGATIONS

#### A.    PVC Pipe Generally

38. PVC Pipe is made from PVC, or polyvinyl chloride, a chlorinated hydrocarbon

polymer used to manufacture a wide array of products.

39.     In the residential and commercial domain, PVC Pipe is used in plumbing, drainage, agricultural irrigation, electricity & telecommunications systems, and the ductwork of heating and cooling systems.

40.     PVC resin, which is a white powder, is the primary ingredient used in the production of PVC Pipe. Roughly half of the world's PVC resin manufactured annually is used for producing pipes.

41.     Additives, such as stabilizers, plasticizers, and lubricants, are added to the PVC resin to enhance the properties of the final product. The raw materials are mixed and compounded to create a homogenous mixture which is then fed into an extruder, which melts the mixture and forces it through a die to create the desired shape. After the PVC mixture is extruded through the die, it enters the cooling and sizing stage. This is where the newly formed pipe is cooled down to a solid state and its dimensions are checked to ensure it meets the required specifications. The cooling process typically involves passing the pipe through a water bath or spray, which rapidly cools the pipe and sets its shape. The sizing process involves passing the pipe through a series of calibrated metal plates or rollers that ensure the pipe has the correct diameter and wall thickness.

42.     PVC processing involves highly developed scientific methods requiring precise control over process variables. The polymer material is a free-flowing powder, which requires the addition of stabilizers and processing aids. Formulation and blending are critical stages of the process and tight specifications are maintained for incoming raw materials, batching and mixing.

43.     PVC fittings are manufactured by high-pressure injection molding. In contrast to continuous extrusion, molding is a repetitive cyclic process, where a "shot" of material is delivered to a mold in each cycle. PVC Pipe fittings like bends, branches, valves, brackets and clips can be

used in a wide range of pipelines and construction.

44.    PVC Pipe fittings can be used to update older pipeline systems that could be wearing out with age. The weakness of pipeline networks lies mainly in the integrity of their joints. PVC Pipe can be used to reinforce the junction points so that the entire network will not have to be revamped.

45.    PVC Pipe is ubiquitous in the context of water supply. The pipelines used for water mains almost entirely consist of PVC Pipe. PVC Pipe is easy to install, dismantle and maintain. Its failure or break rate is extremely low when compared to that of legacy materials such as metal and concrete. PVC Pipe is also lightweight and easy to transport. An advantageous chemical property of PVC is its inertness or resistance to chemical reactions with other substances. This makes it safe for the transportation of drinking water and water that is used for household purposes.

46.    PVC Pipe is also used for sewage systems, rainwater drainage from roofs and other structures, sprinkler systems for landscaping, and fire sprinkler systems in buildings.

47.    PVC Pipe is also used as the insulating sheath on electrical cable because of its good electrical insulation, ease of extrusion, and resistance to burn.  PVC Conduit offers significant competitive advantages over traditional conduit, including pliability, lower installation cost, and lower susceptibility to short-circuiting.

48.    Purchasers of PVC Pipe operate in the construction, irrigation, water supply, sewer & drain, plumbing, oil and gas, heating, ventilation, and air conditioning, and other sectors and include municipalities, private water companies, professional contractors, retailers, and distributors.[3]

---

[3]    *PVC Pipes Market To Reach USD 107.92 Billion by 2032, Growing at CAGR 7.01%*, GlobeNewswire (Feb. 20, 2025), https://www.globenewswire.com/news-

**B.    The Market for PVC Pipe**

49.    The global PVC Pipe market was valued at $58.65 billion in 2023 and is likely to reach $107.92 billion by 2032.[4]

50.    Converter Defendants are the dominant manufacturers and sellers of PVC Pipe in the United States and its territories.

51.    In the United States, PVC Pipe is used widely.  For example, it is used in two thirds of water distribution applications and three quarters of sanitary sewer pipe applications.[5]

52.    PVC Pipe is favored over other types of piping because it has a longer life expectancy, low percentage of failure during use, has very little environmental impact and, since it weighs less than the other types of piping, uses much less energy through the entire manufacturing and installation process.[6]

53.    During the Class Period, the Converter Defendants, directly or through their subsidiaries or other affiliates, sold PVC Pipe in the United States in a continuous and uninterrupted flow of interstate commerce, including through, in, into, or from this District.

54.    PVC Pipe is a commodity product with little or no differentiation based on the

---

release/2025/02/20/3029418/0/en/PVC-Pipes-Market-To-Reach-USD-107-92-Billion-by-2032-Growing-at-CAGR-7-01-Finolex-Industries-Ltd-Polypipe-PLC-Avient-Corporation.html (last visited Mar. 30, 2025).

[4]    *PVC Pipes Market Synopsis*, Introspective Market Research, (Aug. 2024) https://introspectivemarketresearch.com/reports/pvc-pipes-market/

[5]    Johnny De N. Martins, et al., Applications and market of PVC for piping industry, SCIELO (Apr. 16, 2009), https://www.scielo.br/j/po/a/NRwcH3CbrZvmpNQgGJgKXVJ/?lang=en

[6]    Comparison of Water Pipe Failure Rates in USA and Canada, UTAH STATE UNIV. (Apr. 2012), https://www.uni-bell.org/Portals/0/ResourceFile/pipe_failure_type_6-5-13.pdf; Hydraulic Analysis: Pumping Costs for PVC and Ductile Iron Pipe, UNI-BELL PVC PIPE ASS'N, https://www.uni-bell.org/Portals/0/ResourceFile/hydraulic-analysis-pumping-costs-for-pvc-and-ductile-iron-pipe.pdf (last accessed Mar. 30, 2025).

producer.

**C.** **Prices for PVC Pipe Rose Precipitously During the Class Period and Remained Elevated Despite Lower Input Prices and Lower Demand**

55.     Prior to the start of the Converter Defendants' conspiracy, PVC Pipe price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market).

56.     But Converter Defendants significantly raised their prices for PVC Pipe during the Class Period, and while the price of PVC resin, the largest input cost for PVC Pipes, stabilized in January of 2023, PVC prices remained artificially inflated.

57.     An investor presentation by defendant Otter Tail detailed how, notwithstanding a **_decline_** in PVC resin price, PVC Pipe prices remained elevated—**_despite lower demand_**.

58.     The following chart appeared in Otter Tail Corporation's presentation during the Sidoti & Company Small-Cap Conference, held on December 6-7, 2023.[7]  In the chart, Otter Tail details how first, "downward slides in resin prices led to lower gross margins as pipe producers chased volume." Then, beginning in 2020, "Resin shortages and strong demand for PVC Pipes drives spread expansion" (sic). But beginning in mid-2021, "Resin prices begin to decline, but sales prices for PVC pipe remain elevated despite lower demand."

---

[7] OtterTail Corporation Presentation, Sidoti & Company Small Cap Conference (Dec. 6-7, 2023), available at https://s1.q4cdn.com/276295446/files/doc_events/2023/Dec/06/sidoti-small-cap-conference-december-2023-final.pdf



59.    In a competitive market, sales prices for PVC Pipe would have dropped when both the price of the main input (resin) and demand for the finished product both dropped—and true competitors would have dropped prices to gain market share.

60.    But this is not what occurred, and the pricing behavior seen in the market was the result of a conspiracy among the Converter Defendants facilitated by OPIS.

**D.    OPIS Acted as a Vehicle for Collusion Facilitating the Defendants' Conspiracy**

61.    OPIS is a commodity price reporting service. It publishes several industry reports, including *PetroChem Wire*, which include benchmark prices multiple commodities (including PVC Pipes).

62.    Until recently, *PetroChem Wire* published the "PVC & Pipe Weekly" report every Friday. PVC & Pipe Weekly touted itself as is the only price reporting service in the United States for finished PVC Pipe, which it classified into "Municipal," "Plumbing," and "Conduit" for its reporting purposes.

63. OPIS, *PetroChem Wire*, and "PVC & Pipe Weekly" are subscription-based and are not publicly available. Potential subscribers must apply and are screened by OPIS. OPIS does not list its subscription fees publicly.

64. OPIS and *PetroChem Wire* claim to have created a methodology in which the numbers published in "PVC & Pipe Weekly" are reflective of that week's "current market realities." Upon information and belief, most, if not all, of the Converter Defendants subscribed to "PVC & Pipe Weekly" and, along with certain other market participants, provide prices, transactions, projections, and other information to OPIS. For multiple years, the Converters have used it as a vehicle to set PVC Pipe prices.

65. "ManBearChicken," a short seller offering investigative research on the industry, reported on July 24, 2024 that it believes that "PetroChem Wire" is the <u>only</u> source for PVC Pipe Prices, and that "few, if any end customers (contractors, municipalities, consumers) have access" to PVC & Pipe Weekly reports.[8]

66. PVC & Pipe Weekly also included commentary by PVC Converters, which often includes specific forward-pricing intentions and invitations to coordinate pricing. In 2024, ManBearChicken published an explosive exposé in the form of a series of Substack blog posts which blew the whistle on collusion in the PVC Pipe industry.

67. As highlighted in the ManBearChicken reporting, the OPIS reports fearlessly and blatantly state price coordination, as well as using code words for collusion, such as "discipline. Examples of this collusion include the following report selections from PVC & Pipe Weekly:"[9]

---

[8] Presentation, *Pipe Price Fixing*, https://manbearchicken.substack.com/api/v1/file/2871f3ca-eae7-4029-9439-b9c6df64691b.pdf at 6.

[9] Presentation, *Pipe Price Fixing*, https://manbearchicken.substack.com/api/v1/file/2871f3ca-eae7-4029-9439-b9c6df64691b.pdf at 8-13 (emphasis added throughout).

a.      January 22, 2021: "While some market participants believed that the market needed to be reset with a new price letter closer to the current price level, others said that there is **no reason converters can't push prices higher** without a new price letter. The **only requirement would be discipline**." (Emphasis added).

b.      October 28, 2022: "The steep drop in pipe demand makes it all the more remarkable that prices have remained rock solid at Block 440. Pipe makers give credit to distributors as they have been partners in the determination not let prices slip. . . At the same time, converters see no reason for prices to drop rapidly once they do start to retreat, as they have **shown discipline thus far** and see no reason why that should change." (Emphasis added).

c.      November 4, 2022: "Municipal pipe prices were still holding on at Block 440. Converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, **but a phone call or two proved that this was not the case**. So far, nobody has blinked . . . converters said they have resigned themselves to the fact that demand will be very low in Nov[ember], Dec[ember], Jan[uary] and Feb[ruary] and that dropping their price won't get them more volume." (Emphasis added).

d.      January 20, 2023: "Northern Pipe and IPEX indicated that **they would follow** whatever the market does." (Emphasis added).

e.      January 27, 2023: "Converters. . . know demand will not kick in for weeks but were **confident that they could hold prices firm** as long as distributors were on the same page." (Emphasis added).

f.      February 3, 2023: "Converters had rallied around a price increase for Feb[ruary] 1 which would **push municipal pipe prices up** . . . . Some competitors had only **grudgingly joined** the effort. . . ."  (Emphasis added).

g.     February 10, 2023: "While the **increase announcements had been unanimous**, not all converts were particularly enthusiastic about the idea of trying to push prices higher in early Feb[ruary]. They said demand was still too low to support raising prices." (Emphasis added).

h.     February 24, 2023: "Converters spoke about working in concert with large distributors for months to **keep pricing from sliding** . . . They expressed some concern about whether distributors would return the favor and help keep prices from dropping once their inventories were depleted, or if they would revert to their previous pricing strategies in an effort to secure the lowest possible pipe prices."  (Emphasis added).

i.     May 26, 2023: With respect to conduit pricing, "[s]ome market participants viewed the new sheets more as an effort to **stem the price erosion** that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and Jun and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that as the originator of the new sheets Atkore needs to take a hard stand next week on new business at the **higher price levels**." (Emphasis added).

j.     June 23, 2023: "Distributors' upper management said they were looking for good prices, but were not trying to push the market down. They said they know that if they demand a really low price, it will quickly spread though the market, which would just lower the value of the inventories they still have. Converters responded that management should tell that to their purchasing people, who are trying to get the lowest possible price every single day. They contended there was a big disconnect between the outlook of management and the actions of their purchasing departments." (Emphasis added).

k.     February 16, 2024: "Converters will know by the end of next week if Jan[uary]

resin prices will be flat, and if their cost for resin is still predicted to increase by 2 cpp for Feb[ruary]. This may give them the backbone to **stop the slide in prices**, competitors said, and try to recoup this impending loss of margin. Some converters expect that new price sheets will be issued for Mar[ch]. They said the sheets will need to be issued at a level below that of the Jan[uary] sheets, as those are now too high above current market levels." (Emphasis added).

l. February 23, 2024: "There was talk in the market this week that the new pipe sheets for Mar[ch] might be coming out next week. But, some converters said, if competitors go out next week and try to lock up a bunch of volume before a Mar[ch] price increase can take effect, they won't be able to raise prices at all. Converters found out this week that their resin costs could possibly rise by a total of 5-6 cpp for Feb[ruary] and Mar[ch] purchases. They concluded that they not only **need to stop the slide in their pipe prices**, but they **must push them higher** if they don't want to lose more margin to (sic) due to the higher resin prices." (Emphasis added).

m. March 15, 2024: "Competitors said **everyone needs to start moving prices up** on business written from now on, or distributors will continue to buy hand to mouth." (Emphasis added).

n. March 22, 2024: "Last Friday, Westlake issued a **price increase letter** taking municipal pipe prices to Block 390 for immediate shipment (for all diameters) and Block 400 for standard quotes, effective Mar 18. National, Jet Stream, IPEX, Atkore, Diamond, Sanderson and JM Eagle **followed with similar letters**, effective Mar[ch] 18 or 19. As usual, Northern and Vinyl Tech did not issue price increase letters, but said they would be raising their prices to the same level." (Emphasis added).

o. April 5, 2024: "The hope is that **prices will continue to move up next week**. Some competitors were still upset because a market leader took hold for release orders at low prices that

keep prices static through May for 10-truck orders and through Jun for 20-truck orders. The converter in question reported that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore." (Emphasis added).

p.      May 3, 2024: "Converters said the price hikes won't work unless **everyone is working together** to implement them." (Emphasis added).

q.      May 10, 2024: "Converters complained that one regional converter was not making any attempt to raise its prices, and had actually dropped its price in the East to $360/100 ft. The converter in question said that until the larger competitors **proved they were moving prices up it** would not do so …. Converters hope to push prices higher next week, but concede it **will have to be a unanimous effort** to have any chance of success." (Emphasis added).

r.      May 17, 2024: With respect to a smaller regional competitor who was holding pricing while other converters were trying to raise prices, "[t]he converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that **market leader in question was quoting higher prices** and the fact that the pricing range rose in the regions outside the East proved it." (Emphasis added).

s.      June 21, 2024: "With a total of 4 cpp in resin price increases on the table, converters acknowledged they will need to **try again to raise prices**. This time, some said, they need to put out price letters with an **increase of no more than 10 Blocks above the current market** and all aim for the same implementation date. Then, if that increase is successful, **do it again**" and "[c]onverters conceded they need to figure out how to push prices higher. The consensus this week was for a **single price increase that would take prices up by about 5% over the current market level**, with another percentage added to account for the discount. Then, if that works, **do it again and again** until it stops working. Conduit converters have been successful with this strategy in the

20

past." (Emphasis added).

t.      June 28, 2024: "Converters lost no time in starting a price increase effort" and reporting Cantex exact prices in the East, South Central, North Central, Southwest and Northwest and that "Prime, National, Southern and IPEX followed with similar sheets for the regions they serve.  Cantex set the discount off the new sheets at 5%."  The publication then reported Atkore company exact prices in the East, South Central, North and Southwest, matching Cantex to the penny.  (Emphasis added).

u.      July 12, 2024: "With six cents in resin price increases staring converters in the face for Jun, Jul and Aug, the **consensus was that they need to get serious about pushing prices up**. . . Some converters said they need to return to the tactics they had employed a few years ago of **going up by only 5 Blocks at a time but doing it repeatedly** until their desired price level was achieved."  (Emphasis added).

v.      July 19, 2024: "Most converters were concerned about the constant erosion of their margins, but were **waiting for a market leader to announce a price hike for them to follow**."  (Emphasis added).

68.     The coordinated price increase efforts facilitated by OPIS were successful in causing actual price increases and preserving those elevated prices.  For example, the early May 2024 increase effort succeeded in driving up the price of PVC Conduit from $3.70/foot on May 3, 2024, to $3.80/foot on May 24, 2024.

69.     Defendant OPIS consciously committed to a common scheme to restrain and stabilize the price of PVC Pipe. It operated not just as a central clearing house for Converters but also purposefully collected and re-circulated the Converter Defendants' competitive-sensitive data, as well as vital information to maintain the high prices set by the Converter Defendants through

their ongoing conspiracy.

70.     The Converter Defendants used the information in the "PVC & Pipe Weekly" report to discuss and signal current and future pricing activities, gain access to confidential data from their "competitors," reach agreement to fix or raise prices, and enforce the agreement among competitors. OPIS thus knowingly provided the Converter Defendants with both a method to collude and a mechanism by which to enforce the conspiracy to artificially inflate prices charged to Plaintiff and the other direct purchasers from the Converter Defendants.

71.     At the end of 2024, OPIS discontinued the PetroChem Wire PVC & Pipe Weekly Report. The last issue was published on November 22, 2024.

**E.    Department of Justice Opens Investigation into PVC Pricing**

72.     Following the publication of the explosive ManBearChicken report publication on July 24, 2024, the Department of Justice opened a criminal grand jury and investigation by at least August 27, 2024, but did not itself reveal the investigation to the public.

73.     Defendant Otter Tail has disclosed that "on August 27, 2024, the Company received a grand jury subpoena issued by the U.S. District Court for the Northern District of California" calling for production of documents "regarding the manufacturing, selling, and pricing of PVC pipe."

74.     On February 14, 2025, Defendant Atkore disclosed that it also received a grand jury subpoena from the U.S. Department of Justice Antitrust Division issued by the U.S. District Court for the Northern District of California, stating:

> On February 13, 2025, the Company received from the U.S. Department of Justice ("DOJ") Antitrust Division a grand jury subpoena issued by the U.S. District Court for the Northern District of California. The subpoena calls for production of documents relating to the pricing of the Company's PVC pipe and conduit products. The Company intends to comply with its obligations under the subpoena.

75. After this disclosure, multiple securities fraud lawsuits accused Atkore (along with its CEO, CFO, and VP of investor relations) of defrauding investors by "failing to disclose that the reason for Atkore's positive [financial] results . . . was that it was engaged in a price-fixing scheme with its United States-based competitors to artificially inflate the prices of PVC pipes."[10]

76. A shareholder derivative complaint also has accused Atkore's current and former executives and members of the board of directors of the same conduct.[11]

77. Atkore's Vice President, Chief Financial Officer and Chief Accounting Officer David P. Johnson abruptly announced his retirement from Atkore on July 23, 2024 after the market closed and the day before the ManBearChicken report was published disclosing the "apparent price fixing" that resulted in "massively inflated pipe prices and converter margins" that defied economic logic.[12]

**F.    The Structure and Characteristics of the Market for PVC Pipe Support the Existence of a Conspiracy**

78. Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

---

[10]    Complaint, *Coles v. Atkore, Inc.*, No. 25-cv-02686 Dkt. 1 at 7 (N.D. Ill. Mar. 14, 2025); *see also Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Atkore*, No. 1:25-cv-01851 (N.D. Ill. Feb. 21, 2025).

[11]    Complaint, *Blatzer v. Waltz*, No. 25-cv-02833 Dkt. 1 (N.D. Ill. Mar. 18, 2025).

[12]    Presentation, *Pipe Price Fixing*, https://manbearchicken.substack.com/api/v1/file/2871f3ca-eae7-4029-9439-b9c6df64691b.pdf at 4.

79. ***Concentration of supply side:*** The Converter Defendants are among the largest producers of PVC Pipe in the United States and together control 95% of the market. Because the manufacture of PVC Pipe is highly concentrated, with the Converter Defendants controlling the vast majority of production, the PVC Pipe market is highly susceptible to collusion.

80. ***Standardization:*** The product is also standardized. As detailed above, OPIS reports on prices for standardized subcategories of PVC Pipes (conduit and municipal). The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure.

81. ***Opportunities to collude at trade association meetings:*** Collusion also may be facilitated by trade associations. In addition to their participation in OPIS, Converter Defendants had the opportunity to collude through multiple trade associations, whose member rolls included at least two Converter Defendants each: the Uni-Bell PVC Pipe Association ("PVCPA"); Plastic Pipe and Fittings Association ("PPFA"); the Plastics Pipe Institute ("PP Institute"); the Vinyl Institute; the Irrigation Association; the National Electrical Manufacturers Association ("NEMA"); and the National Association of Electrical Distributors ("NAED").

82. ***Vertical integration:*** The PVC Pipe industry is vertically integrated. For example, Westlake Pipe boasts that "vertical integration with Westlake [Corp.] provides our pipe plants with a consistent supply of premium quality PVC resin …."[13] Westlake's PVC Resin is produced at four production facilities in the United States which, in turn, "benefit from vertical integration as the primary raw material to produce PVC resin, vinyl chloride monomer (VCM), is produced at

---

[13] Westlake Pipe & Fittings, Westlake Pipe & Fittings Advantages, *available at* https://pimmedia.winsupplyinc.com/pim/CUT/022024/__6946PVCFC40020_CUT.pdf (last visited Mar. 31, 2025).

Westlake plants in Calvert City, KY; Geismar, LA; Plaquemine, LA; and near Lake Charles, LA."[14]

83.    ***High barriers to entry:*** There are also high barriers to becoming a manufacturer of PVC Pipe. A large capital investment is required to enter the industry as companies wishing to enter must purchase machines and operating space to manufacture plastic pipes and parts. The importance of research and development in the industry also may deter new entrants.

84.    Potential entrants to the industry also must make a significant financial investment to acquire, maintain and update production facilities and equipment. Larger players have an advantage because they are able to build or acquire multiple manufacturing facilities and discouraging others from entering.

85.    Thus, the start-up capital necessary to compete with today's PVC Pipe manufacturers would be substantial. PVC Pipe manufacturers have significant economies of scale, utilizing large and expensive production facilities. Barriers to entry in PVC Pipe manufacturing both prevent new competitors from entering the market, and make the market susceptible to collusion.

86.    ***Inelastic demand:*** Demand for PVC Pipe is inelastic. Industries with inelastic demand, such as the PVC Pipe manufacturing industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

87.    A lack of substitute goods may be a characteristic of inelastic demand. PVC Pipes cannot be interchanged freely with other goods—although there are other plastic piping materials, PVC has "completely different features in terms of performance and functions compared with

---

[14]    Westlake, PVC Resin, *available at* https://www.westlake.com/chlorovinyls/pvc-resin (last visited Mar. 31, 2025).

other plastics."[15]

88.    The unique qualities of PVC include: flexibility; fire retarding; durability; oil and chemical resistance; mechanical stability; mouldability; electrical insulation; and strength.

89.    Customers similarly do not view PVC as interchangeable with other piping material options.

90.    ***Unconcentrated demand side:*** The unconcentrated nature of the demand side of the PVC Pipe market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Converter Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

91.    ***History of antitrust violations:*** Finally, OPIS has been the subject of antitrust scrutiny. In 2020, the California Attorney General brought a lawsuit against two energy companies, Vitol and SK, alleging, in part, that they reported manipulated gasoline trades to OPIS for the purpose of driving up the benchmark prices of regular and premium gasoline in the OPIS spot market report. On July 11, 2024, California reached a $50 million settlement with Vitol and SK Energy, resolving the allegations.

## V.    ANTITRUST IMPACT AND DAMAGES TO THE PLAINTIFF AND THE CLASS

119.    Because of the Defendants' anticompetitive conduct: (1) competition in the PVC Pipe market has been reduced or eliminated, (2) prices for PVC Pipe have been maintained at supracompetitive levels, and (3) direct purchasers of PVC Pipe have been deprived of the benefit

---

[15]    European Council of Vinyl Manufacturers, *PVC's physical properties*, https://pvc.org/about-pvc/pvcs-physical-properties/ (last visited Mar. 31, 2025).

of price competition.

120.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members

paid more for PVC Pipe than they otherwise would have and thus suffered antitrust injury and

damages. The overcharges paid by Plaintiff and members of the Class for PVC Pipe constitutes

antitrust injury and harm to competition under the federal antitrust laws.

## VI.    CLASS ACTION ALLEGATIONS

121.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a),

(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the

"Class"):

> All persons and entities in the United States and its territories who
> purchased PVC Pipe directly from any of the Converter Defendants
> or their subsidiaries or affiliates during the period beginning no later
> than January 1, 2021 until the date on which a class is certified in
> this case. Excluded from the Class are Defendants, their parent
> companies, subsidiaries, affiliates, officers, directors, employees,
> assigns, successors, agents, or co-conspirators, and the court and its
> staff.

122.    The Class definition is objective and its members can be ascertained from

Defendants' records.

123.    *Numerosity.* While Plaintiff does not know the exact number of members of the

Class, Plaintiff believes the class size is so numerous that joinder is impracticable given

Defendants' substantial nationwide presence.

124.    *Commonality.* Common questions of law and fact exist as to all members of the

Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct,

which was generally applicable to all the members of the Class, thereby making relief with respect

to the Class as a whole appropriate. Such questions of law and fact common to the Class include,

but are not limited to:

    (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of PVC Pipe in the United States and its territories;

    (b)    The identity of the participants in the alleged conspiracy;

    (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    (d)    Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

    (e)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

    (f)    The effect of the alleged conspiracy on the price of PVC Pipe during the Class Period;

    (g)    Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

    (h)    The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

    (i)    The appropriate class-wide measure of damages.

125.    *Typicality.* Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for PVC Pipe from Converter Defendants and/or their co-conspirators.

126.    *Adequacy.* Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

127. **Predominance.** The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

128. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

129. Through their actions of combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for PVC Pipe in the United States and its territories, Defendants and their co-conspirators have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## VII.  INTERSTATE TRADE AND COMMERCE

130. Hundreds of millions of dollars of transactions in PVC Pipe are entered into each year between numerous states and territories in the United States and  the payments for those transactions flowed from and between these states and territories.

131. Defendants' conspiracy had a direct, substantial, and foreseeable impact on

interstate commerce in the United States and its territories.

132.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for PVC Pipe in the United States.

133.     Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of PVC Pipe sold in the United States, the prices of PVC Pipe would have been determined by a competitive, efficient market, and therefore would have been lower.

## VIII.   ANTITRUST INJURY

134.     Defendants' antitrust conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to the pricing of PVC Pipe;

(b)     The prices of PVC Pipe have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of PVC Pipe have been deprived of the benefits of free and open competition; and

(d)     Purchasers of PVC Pipe paid artificially inflated prices.

135.     The purpose of the conspiratorial and unlawful conduct of Defendants and their coconspirators was to fix, raise, stabilize, and/or maintain the price of PVC Pipe.

136.     The precise amount of the overcharge impacting the prices of PVC Pipe paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

137.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for PVC Pipe than they would have paid in the absence of Defendants' illegal contract, combination,

or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is a type of antitrust injury that the antitrust laws were meant to punish and prevent.

## IX.    CLAIM

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
### (Conspiracy in Restraint of Trade)

138.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

139.    Beginning as early as January 1, 2021, the exact date being unknown, until the date on which any Class is certified, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regard to PVC Pipe in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

140.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for PVC Pipe in the United States and its territories.

141.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

(a)    Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of PVC Pipe sold in the United States and its territories;

(b)    Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of PVC Pipe, including surcharges on PVC Pipe sold in the United States and its territories; and

(c)    Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

142.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of PVC

Pipe.

143.    Defendants' conspiracy had the following effects, among others:

    (a)    Price competition in the market for PVC Pipe has been restrained, suppressed, and/or eliminated;

    (b)    Prices for PVC Pipe provided by Converter Defendants and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

    (c)    Plaintiff and members of the Class who purchased PVC Pipe from Converter Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

144.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for PVC Pipe purchased from Converter Defendants and their coconspirators than they would have paid and will continue to pay in the absence of the conspiracy.

145.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

146.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants to prevent and restrain the violations alleged herein.

## X.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this Action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    The Court adjudge and decree that the acts of the Defendants are illegal and

unlawful, including the agreement, contract, combination, or conspiracy, and that acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.      <u>JURY DEMAND</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  March 31, 2025                          Respectfully submitted,

                                                 /s/ Stephanie A. Scharf

                                                Stephanie A. Scharf
                                                **SCHARF BANKS MARMOR LLC**
                                                30 W Hubbard St, Ste 500
                                                Chicago, IL 60654
                                                Telephone: (312) 662-6999
                                                Email: sscharf@scharfbanks.com

                                                Linda P. Nussbaum*
                                                Meghan J. Talbot*
                                                **NUSSBAUM LAW GROUP, P.C.**
                                                1133 Avenue of the Americas, 31st Floor
                                                New York, NY 10036
                                                Telephone: (917) 438-9189
                                                Email: lnussbaum@nussbaumpc.com
                                                Email: mtalbot@nussbaumpc.com

                                                Roberta D. Liebenberg*
                                                Gerard A. Dever*
                                                Jeffrey B. Gittleman
                                                **FINE, KAPLAN AND BLACK, R.P.C.**
                                                One South Broad Street, 23rd Floor
                                                Philadelphia, PA  19107
                                                Telephone: (215) 567-6565
                                                Email: rliebenberg@finekaplan.com
                                                Email: gdever@finekaplan.com
                                                Email: jgittleman@finekaplan.com

                                                James E. Cecchi*
                                                **CARELLA, BYRNE, CECCI, BRODY
                                                & AGNELLO, P.C.**
                                                5 Becker Farm Road
                                                Roseland, NJ 07068
                                                Telephone: (973) 994-1700
                                                Email: jcecchi@carellabyrne.com

                                                *pro hac vice application forthcoming*

                                                *Attorneys for Plaintiff*

34